FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

May 04, 2026

SEAN F. MCAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PUBLIC UTILITY DISTRICT NO. 1 OF CHELAN COUNTY, a Washington municipal corporation; PUBLIC UTILITY DISTRICT NO. 1 OF DOUGLAS COUNTY, a Washington municipal corporation; and PUBLIC UTILTIY DISTRICT NO. 2 OF GRANT COUNTY, a Washington municipal corporation, | NO. 2:24-CV-0204-TOR |
| Plaintiffs/Counter-Defendants, | ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT |
| v. | |
| JOHN HAIRSTON, Administrator of the Bonneville Power Administration, in his Official Capacity as Chairman of the United States Entity for the Columbia River Treaty; and BRIGADIER GENERAL GEOFF VAN EPPS, Commander, U.S. Army Corps of Engineers, Northwestern Division, in his Official Capacity as Member of the United States Entity for the Columbia River Treaty, | |
| Defendants/Counter-Plaintiffs. | |

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 1

BEFORE THE COURT are Plaintiffs/Counter-Defendants' Motion to Dismiss (ECF No. 49) and Defendants/Counter-Plaintiffs' Motion for Partial Summary Judgment (ECF No. 53). These matters were submitted for consideration without oral argument. The Court has reviewed the record and files herein and is fully informed. For the reasons discussed below, Plaintiffs/Counter-Defendants' Motion to Dismiss (ECF No. 49) is **DENIED** and Defendants/Counter-Plaintiffs' Motion for Partial Summary Judgment (ECF No. 53) is **GRANTED**.

## BACKGROUND

This action arises from a treaty between the United States and Canada called the Columbia River Treaty (the "Treaty). The Court previously provided a detailed background of the Treaty and the claims of this action in its February 7, 2025 Order. ECF No. 29. To summarize, Canada constructed several dams pursuant to the Treaty in the upper Columbia River upstream of the Canada border to coordinate storage and release of downstream water for purposes of flood control and improving generating capabilities of hydroelectric dams downstream, otherwise referred to as the "improved stream flow." *Id.* at 2. In exchange, the United States agreed to return half of the downstream power benefits ("Downstream Power Benefit") created by the Canada dams to Canada as electricity known as the "Canadian Entitlement." Article XI of the Treaty

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 2

provides:

1. Improvement in stream flow in one country brought about by operation of storage con-structed under the Treaty in the other country shall not be used directly or indirectly for hydroelec-tric power purposes except:

(a) In the case of use within the United States of America with the prior approval of the United States entity, and

(b) in the case of use within Canada with prior approval of the authority in Canada having jurisdiction.

2. The approval required by this Article shall not be given except upon such conditions, con-sistent with the Treaty, as the entity or authority considers appropriate.

ECF No. 29 at 3-4.

The referenced United States entity ("U.S. Entity") comprises the Administrator of the Bonneville Power Administration ("BPA") and the Commander of the U.S. Army Corps of Engineers, Northwestern Division. *Id.* at 4.

Plaintiffs/Counter Defendants, (collectively the "Mid-Cs"), are non-governmental public utility districts that each own and operate a hydroelectric generating facility along the middle portion of the Columbia River. Pursuant to previous agreements with the U.S. Entity, the Mid-Cs were permitted to use the improved stream flow in accordance with the Treaty but were responsible for contributing 27.5% of the hydroelectric power needed for the Canadian Entitlement. *Id.* at 4-5. The most recent agreement expired on September 15, 2024. *Id.* at 5. The U.S. Entity alleges that the Mid-Cs have continued to use the

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 3

improved stream flow after the September 15, 2024 expiration of the agreement but have ceased contributing to the Canadian Entitlement.  *Id.*

The Mid-Cs filed a Complaint (ECF No. 1) on June 17, 2024, and Supplemental Complaint (ECF No. 12) on October 11, 2024, alleging an assortment of claims against the U.S. Entity.  In its Answer (ECF No. 15), the U.S. Entity asserted counterclaims requesting injunctive relief prohibiting the Mid-Cs' use of the improved stream flow contrary to the Treaty; declaratory judgment that the Mid-Cs have acted in a manner inconsistent with the Treaty; and the amounts by which the Mid-Cs have been unjustly enriched through their actions.  ECF No. 29 at 9.  The parties filed cross motions to dismiss in November 2024.  ECF Nos. 18, 20.  On February 7, 2025, the Court granted the U.S. Entity's motion and dismissed the Mid-Cs' claims and denied the Mid-Cs' motion to dismiss the U.S. Entity's counterclaims.  ECF No. 29.

The merits of the Mid-Cs' previous motion to dismiss turned on whether Section 1 of Article XI of the Treaty prohibiting use of the improved stream flow without the U.S. Entity's approval was self-executing or not.  The Court concluded that it retained subject matter jurisdiction over the U.S. Entity's counterclaims only if the provision was self-executing.  After considering relevant case law and the text of the Treaty, the Court concluded that Section 1 of Article XI was self-executing while Section 2 was not.  ECF No. 29 at 12-16.  Therefore, the Court

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 4

determined it had subject matter jurisdiction over the U.S. Entity's counterclaims.

The Mid-Cs now bring a second motion to dismiss on the grounds that the Court lacks subject matter jurisdiction and that the U.S. Entity's claims are not ripe for review. ECF No. 49. The U.S. Entity additionally brings a motion for partial summary judgment seeking a Court order that the Mid-Cs have violated Article XI of the Treaty as a matter of law. ECF No. 53. The Court will consider each motion in turn.

## DISCUSSION

### I.    The Mid-Cs' Motion to Dismiss

The Mid-Cs first seek dismissal of the U.S. Entity's counterclaims on the basis that the Court lacks subject matter jurisdiction. The Mid-Cs contend that executive actions by the U.S. Entity after the Court's previous Order warrant reconsideration of the Court's conclusion that it has authority to adjudicate the U.S. Entity's counterclaims. ECF No. 49 at 7-8. Thus, the Mid-Cs' argument is one for reconsideration. The Mid-Cs additionally argue that the U.S. Entity's claims are not judicially ripe and must be dismissed regardless of the Court's decision on the reconsideration. *Id.* at 31. For the reasons discussed below, the Mid-Cs motion to dismiss is **denied**.

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 5

**A. Reconsideration**

A motion for reconsideration of a judgment may be reviewed under either Federal Rule of Civil Procedure 59(e) (motion to alter or amend a judgment) or Rule 60(b) (relief from judgment). *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993). "Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Id*. at 1263; *United Nat. Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 780 (9th Cir. 2009). "There may also be other, highly unusual, circumstances warranting reconsideration." *School Dist. No. 1J*, 5 F.3d at 1263.

Whether to grant a motion for reconsideration is within the sound discretion of the court. *Navajo Nation v. Confederated Tribes and Bands of the Yakima Indian Nation*, 331 F.3d 1041, 1046 (9th Cir. 2003). A district court does not abuse its discretion when it disregards legal arguments made for the first time on a motion to alter or amend a judgment. *United Nat. Ins. Co.*, 555 F.3d at 780 (quotation marks and citations omitted); *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) ("A Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation.").

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 6

Reconsideration is properly denied when the movant "present[s] no arguments . . . that had not already been raised" previously. *Taylor v. Knapp*, 871 F.2d 803, 805 (9th Cir. 1989); *see also City of Fresno v. United States*, 709 F.Supp.2d 888, 916 (E.D. Cal. 2010) ("A party seeking reconsideration must show more than a disagreement with the Court's decision, and recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden.").

As a rule, a court should be loathe to revisit its own decisions in the absence of extraordinary circumstances such as where the initial decision was "clearly erroneous and would work a manifest injustice." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). Moreover, as this Court cautioned in its January 6, 2026 Corrected Amended Bench Trial Scheduling Order, "Motions to Reconsider are disfavored" and "must show manifest error in the prior ruling or reveal new facts or legal authority which could not have been brought to the Court's attention earlier." ECF No. 46 at 7.

After reviewing the Mid-Cs' materials, the Court does not find reconsideration of its previous decision is warranted. The Mid-Cs contend that in order to prove that the Mid-Cs have utilized improved stream flow, the U.S. Entity will invariably reference a series of agreements (collectively the "Entity Agreements") with the Canadian Entity that implement the Agreement in Principle

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 7

of the modernization of the Treaty.  ECF No. 49 at 22.  More specifically, the Columbia River Treaty Entity Agreement Regarding the Interim Period Determination of Downstream Power Benefits ("*Interim DPB Entity Agreement*") which sets out the power benefits Canada is entitled to under the Treaty from 2025 through 2044.  ECF Nos. 49 at 22, 20-4 at 607.  This would be improper, the Mid-Cs argue, because the *Interim DPB Entity Agreement*, and the Entity Agreements in general, are without domestic legal effect until the terms are approved by the Senate and ratified by the President.  ECF No. 49 at 22.   The Mid-Cs' assertion is based on its contention that the Entity Agreements modify rather than implement the Treaty.  However, several of the agreements within the Entity Agreements, including the *Interim DPB Entity Agreement*, were available to the Mid-Cs prior to their first motion to dismiss with several even mentioned in their motion.  ECF No. 20 at 21.  Thus, Plaintiffs attempt to raise new legal arguments previously available to them is not well taken by the Court.  Moreover, the U.S. Entity directly refutes the Mid-Cs' assertion that it will rely on the *Interim DPB Entity Agreement* in arguing its claims.  ECF No. 57 at 5.

Next, much of the Mid-Cs' argument rests on its assertion that the Court previously concluded that the entire Treaty was not self-executing other than Article XI, Section 1.  This is incorrect.  The Court noted in its previous Order that some of the Treaty text, such as that of Article XIV, "weigh in favor of finding at

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 8

least a portion of the Treaty as non-self-executing." ECF No. 29 at 15. The Court then narrowed its assessment specifically to Article XI and Article III, the portions of the Treaty at issue in the parties' previous cross motions to dismiss. ECF Nos. 15 at 8, 20 at 26-39. The Court concluded that Article III is not self-executing and that "Article XI, Section 1 is a self-executing provision while Section 2 is not." ECF No. 29 at 16, 19. It did not conclude, as the Mid-Cs' assert, "that with the sole exception of section 1 of Article XI, the Treaty is not self-executing." ECF No. 49 at 29. The Court will not make a determination of whether the remaining parts of the Treaty are self-executing or not unless adjudicating this action requires the Court to do so.

The Mid-Cs go on to request that the Court revisit its prior ruling that Article XI, Section 1 is self-executing but Section 2 is not. ECF No. 62 at 10-14. However, the Mid-Cs' arguments in support do not demonstrate "manifest error" in the Court's ruling warranting reconsideration.

The Mid-Cs argue that the Court's cited authority, *Lidas, Inc. v. United States*, 238 F.3d 1076 (9th Cir. 2001), does not support its conclusion that a treaty provision can be severed mid-article for execution purposes. ECF No. 62 at 11. The Mid-Cs point to the fact that the treaty provisions the *Lidas* court held to be self-executing related to an entirely different party of the treaty than those that were not self-executing. ECF No. 62 at 11; *Lidas*, 238 F.3d at 1080-1081. Even if

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 9

that was the case in *Lidas*, its holding does not preclude the possibility that a treaty article may have both self-executing and not self-executing sections as demonstrated by the Ninth Circuit's holding in *CLMS Management Services Limited Partnership v. Amwins Brokerage of Georgia, LLC*, 8 F.4th 1007, 1012 (9th Cir. 2021) ("[W]e conclude Article II, Section 3 of the Convention is self-executing."); *see also Green Enters., LLC v. Hiscox Syndicates Ltd. at Lloyd's of London*, 68 F.4th 662, 669 (1st Cir. 2023) ("[W]e see no reason why the assumed non-self-executing status of Article II(1) must carry over to Article II(3)."). Thus, the Court is not persuaded that its ruling that only Section 1 was self-executing was improper.

The Mid-Cs also argue that the Court is without authority to determine how much energy the Mid-Cs must contribute to the Canadian Entitlement. However, the U.S. Entity does not seek an order demanding the Mid-Cs contribute to the Canadian Entitlement going forward but rather an injunction prohibiting the Mid-Cs continued use of the improved stream flow for hydroelectric purposes without U.S. Entity approval. ECF No. 15 at 8. The Mid-Cs further argue that there is no standard by which the Court can calculate what the improved stream flow is and how much is available to the Mid-Cs for their use. ECF No. 49 at 30. The Court again disagrees. The U.S. Entity may demonstrate that the Mid-Cs are using "Improvement in stream flow in one country brought about by operation of storage

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 10

constructed under the Treaty in the other country" as discussed in the U.S. Entity's motion for partial summary judgment.

Furthermore, the Court's conclusion that Section 2 is not self-executing, but Section 1 is, does not limit the Court's ability to provide redress to the U.S. Entity. The U.S. Entity seeks to enjoin the Mid-Cs from continuing to utilize the improved stream flow without U.S. Entity approval, which the Court may do pursuant to Section 1. Additionally, the Court is not persuaded that it is unable to provide relief for the U.S. Entity's unjust enrichment claim. "To state a claim for unjust enrichment, Plaintiff must show that: (1) Plaintiff conferred a benefit upon Defendant, (2) at Plaintiff's expense, and (3) the circumstances make it unjust for Defendant to retain the benefit without payment." *Nienaber v. Overlake Hospital Med. Ctr.*, 733 F. Supp. 3d 1072, 1093 (W.D. Wash. 2024). The U.S. Entity has made such allegations here as to avoid dismissal. The Mid-Cs contend that adjudicating the unjust enrichment claim necessarily requires the Court to calculate the Canadian Entitlement which it cannot do based on Article XI, Section 1 alone. ECF No. 62 at 15. As discussed *supra*, the Court did not conclude that the entire Treaty was not self-executing other than Article XI, Section 1. In any event, the current posture of the case does not persuade the Court that it lacks jurisdiction over the unjust enrichment claim at this time. The Mid-Cs' remaining arguments do not persuade the Court that reconsideration of its prior decision is warranted.

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 11

## B. Ripeness

The Mid-Cs argue that the U.S. Entity's counterclaims are not ripe for adjudication. ECF No. 49 at 31. "Ripeness has two components: constitutional ripeness and prudential ripeness." *In re Coleman*, 560 F.3d 1000, 1004 (9th Cir. 2009). Constitutional ripeness, similar to Article III standing, rests on "whether the issues presented are 'definite and concrete, not hypothetical or abstract.' " *Ass'n of Irritated Residents v. U.S. Env't Prot. Agency*, 10 F.4th 937, 944 (9th Cir. 2021) (quoting *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010)). The U.S. Entity's claim that the Mid-Cs continue to use the improved stream flow without U.S. Entity approval in violation of Article XI, Section 1, is sufficiently "definite and concrete" to satisfy constitutional ripeness.

To assess prudential ripeness, the Court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). The Mid-Cs argue that this case should not be adjudicated until Treaty negotiations have concluded and a modernized treaty has been ratified. ECF No. 49 at 36-37. They also argue the U.S. Entity will suffer no hardship from any delay because the energy at issue in this case relative to the U.S. Entity is trivial. *Id.* at 37. The U.S. Entity argues that the issues are fit for judicial resolution as the Treaty remains in force and the Mid-Cs continue to utilize the improved stream flow without U.S.

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 12

Entity approval.  ECF No. 57 at 10-11.  The U.S. Entity also argues that by failing to contribute to the Canadian Entitlement, the U.S. Entity has had to contribute the Mid-Cs share thereby forcing other ratepayers to cover the additional amount.  *Id.* at 11.  The Mid-Cs again argue that the Court cannot determine what the Mid-Cs' fair share is because the Canadian Entitlement is not established.  ECF No. 62 at 19-20.  For the reasons previously discussed, the Court concludes prudential ripeness is satisfied.

The Mid-Cs' motion to dismiss is **denied**.

**II.    The U.S. Entity's Motion for Partial Summary Judgment**

The U.S. Entity moves for summary judgment that the Mid-Cs have utilized the improved stream flow in violation of Article XI, Section 1.  ECF No. 53.  For the reasons discussed below, the U.S. Entity's motion is **granted**.

**A. Summary Judgment Standard**

The Court may grant summary judgment in favor of a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court must only consider admissible evidence.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).  The party moving for summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 13

317, 323 (1986). The burden then shifts to the non-moving party to identify specific facts showing there is a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law. *Id.* at 248. Further, a dispute is "genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* The Court views the facts, and all rational inferences therefrom, in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## B. Analysis

The U.S. Entity requests the Court grant partial summary judgment and find that the Mid-Cs have violated Article XI, Section 1 of the Treaty as a matter of law. *Id.* at 15.

The U.S. Entity asserts that the Mid-Cs have complied with the terms of Article XI for sixty years by contributing 27.5% of the power for the Canadian Entitlement. *Id.* at 4. The U.S. Entity argues that the facts are undisputed that the Mid-Cs were on notice that they did not have approval to use the improved stream flow to generate hydroelectric power after the September 15, 2024 expiration of

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 14

the CEAEA unless they continued to contribute 27.5% of the Canadian Entitlement. ECF No. 56 at ¶ 7. The U.S. Entity contends that nevertheless the Mid-Cs continued to use the improved stream flow for hydroelectric purposes after September 15, 2024 but ceased contributing to the Canadian Entitlement. *Id.* at ¶ 8. Therefore, the U.S. Entity asserts that the Mid-Cs began violating Article XI, Section 1 beginning September 16, 2024, and have continued to do so since. *Id.*

Furthermore, the U.S. Entity argues that the Mid-Cs cannot demonstrate that an issue of fact exists as to whether they have used the improved stream flow after September 15, 2024. The U.S. Entity asserts that it is undisputed that before and after September 15, 2024, Canada operated, and continues to operate, its upstream dams in a manner consistent with the Treaty to provide improved stream flow to the United States. *Id.* at ¶ 11. Prior to the construction of the dams in Canada, the Columbia River suffered extreme seasonal variations in stream flow that ranged from 14,000 cubic feet per second ("cfs") to 550,000 cfs at the U.S./Canadian border. *Id.* at ¶ 12. This large seasonal fluctuation limited the water available for hydroelectric power production throughout the year. *Id.* at ¶ 14. In contrast, in 2025, the stream flow at the U.S./Canadian border ranged from 34,500 cfs to 133,000 cfs. *Id.* at ¶ 13. This improvement in stream flow has resulted in more water availability for hydroelectric production. *Id.*

The U.S. Entity further argues that the Mid-Cs even admitted during

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 15

Case 2:24-cv-00204-TOR    ECF No. 71    filed 05/04/26    PageID.3223    Page 16 of 22

discovery that several of the Mid-C dams made physical changes to make use of the improvement in stream flow. ECF No. 56 at ¶¶ 15,16. For example, four additional generators were installed at Rocky Reach Dam in 1969 and a second powerhouse consisting of eight turbine generators was installed at Rock Island Dam in 1974. *Id.*

The Mid-Cs respond that summary judgment is inappropriate because an issue of fact exists as to whether they have made use of the improved stream flow for hydroelectric purposes. The Mid-Cs argue that changes that occurred to the Rocky Reach and Rock Island dams more than 50 years ago do not mean the Mid-Cs are currently making use of the improved stream flow. ECF No. 63 at 16.

The Mid-Cs additionally make the argument that the improvements in seasonal shifts of stream flow does not necessarily equate to the Mid-Cs using such improved stream flow because the Grand Coulee and Chief Joseph dams control the flow to the Mid-Cs. *Id.* at 12-14. The Mid-Cs argue that previous coordination of power operations between the Mid-Cs and the U.S. Entity pursuant to the Treaty allowed the Mid-Cs to maximize access to the improved stream flow because the Mid-Cs could request a release of water from Grand Coulee for generation when needed and then return that power back at a later time when they had surplus capacity. *Id.* at 13-14. The Mid-Cs contend that the cessation of the coordination has significantly eroded their ability to make use of the improved stream flow, if at

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 16

all. *Id.* at 14. In making this argument, the Mid-Cs rely on declarations submitted by Shane Bickford, the Douglas County PUD Assistant Manager for Power Planning (ECF No. 64), and Dr. Richard McCann, a Ph.D in Resource Economics (ECF No. 66). After reviewing the provided declarations, the Court does not find that they raise an issue of fact as to whether the Mid-Cs have made use of the improved stream flow.

### a. Declaration of Shane Bickford

Mr. Bickford's states in his declaration that the Mid-Cs reduced ability to effectively use the stream flow and previous allocation agreements do not support the U.S. Entity's demand that the Mid-Cs owe 27.5% of the Canadian Entitlement. ECF No. 64 at 8-15.

For example, Mr. Bickford states

> any seasonal adjustment in flow that might otherwise be an improvement in stream flow available to the Mid-Cs for hydroelectric generation is either attenuated at Grand Coulee, spilled due to inflow uncertainty, delivered in low value periods making it unavailable in high value months, or delivered in diminished value because generation cannot be matched to load (sold as low value non-firm energy instead of as firm power).

*Id.* at ¶ 26. However, whether the improved stream flow is attenuated, delivered in low value periods, or delivered in diminished value, it is still being delivered to some extent. Article XI, Section 1 requires prior approval from the U.S. Entity for *any* use of the

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 17

improved stream flow for hydroelectric power purposes.  Thus, the U.S. Entity need only demonstrate that the Mid-Cs have utilized any improved stream flow for hydroelectric purposes after September 15, 2024, regardless of how small.

Mr. Bickford also asserts that there is no evidence that the Mid-Cs get improved stream flow which they use for hydroelectric power generation.  *Id.* at 16.  Yet, he also contends that the U.S. Entity's own analysis on the annual average Mid-C benefit associated with Canadian storage "has never shown more than a 6.5aMW contribution is appropriate" and that that estimate is "likely to be smaller given the lack of domestic coordination and the ongoing and regular impacts associated with non-power considerations."  *Id.* at ¶¶ 29,30.  Moreover, Mr. Bickford concludes that "if the Mid-Cs received improved stream flow, it is clear that the Mid-Cs were routinely obligated to spill a substantial portion of it rather than use it for hydroelectric power generation."  *Id.* at ¶ 51.  Again, the amount of improved stream flow being utilized by the Mid-Cs is irrelevant for purposes of Article XI and the U.S. Entity's motion.

b. *Declaration of Dr. McCann*

The declaration of Dr. McCann similarly focuses on the Mid-Cs reduced generation capacity due to lack of coordination with the upper federal dams.  ECF No. 66.  Again, even if the Mid-Cs are not realizing the power benefit from the improved stream flow does not mean they have not used the improved stream flow

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 18

for hydroelectric power generation.  The Treaty provides that "Canada shall provide in the Columbia River basin in Canada 15,500,000 acre-feet of storage usable for improving the flow of the Columbia River."  Art. II, Section 1.  Article III of the Treaty further provides,

> The United States of America shall maintain and operate the hydro electric facilities included in the base system and any additional hydroelectric facilities constructed on the main stem of the Columbia River in the United States of America *in a manner that makes the most effective use of the improvement in stream flow* resulting from operation of the Canadian storage for hydro-electric power generation in the United States of America power system.

Art. III, Section 1 (emphasis added).

Thus, even if the Mid-Cs are unable to make the most effective use of the water that is released from the upper federal dams due to the lack of coordination, that does not mean that the Mid-Cs do not have access to the improved stream flow.

Dr. McCann also asserts that as the BPA is able to release water independently from the operation of Canadian storage, the Mid-Cs have little to no access to the improvement in stream flow from Canadian storage.  ECF No. 66 at ¶ 34.  However, the Court agrees with the U.S. Entity that by this reasoning, Grand Coulee is the only dam on the entire Columbia River that receives improved stream flow from Canadian storage.  ECF No. 69 at 7.  Furthermore, the U.S. Entity provides data of the historic stream flow levels between Chief Joseph dam and the first Mid-C project, Wells dam, from 1952 through 2026 that clearly indicate a

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 19

sustained reduction in magnitude of seasonal variation in flows after the construction of the Canadian dams in the early 1970s. ECF No. 69 at 8. Prior to 1975, the average weekly flow during high runoff months of March through June was 159.5 kcfs with a standard deviation of 98.2, while it was 118.8 kcfs with a standard of deviation of 42.1 during those same months after 1974. ECF No. 69 at 8-9. This evidence contradicts the Mid-Cs contention that stream flow below Grand Coulee dam was not improved by Canadian storage or that the Mid-Cs have not had access to it after September 15, 2024.

This evidence additionally permits a presumption that the Mid-Cs have utilized the improved stream flow for hydroelectric power generation to some extent after September 15, 2024. It does not appear that the Mid-Cs made any changes in conduct after the agreement expired to avoid using the improved stream flow. *See* ECF No. 68 at 9. Rather the Mid-Cs continued the usual course of business but ceased contributing to the Canadian Entitlement on the basis that "U.S. Entity has not shown there is an improvement in stream flow for hydroelectric power" and the "Mid-Cs do not know whether there is an improvement in stream flow for hydroelectric power." *Id.* at 8. As the U.S. Entity has demonstrated that the improved stream flow has been available to the Mid-Cs, it follows that the Mid-Cs have almost certainly utilized it for hydroelectric purposes since September 16, 2024.

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 20

Based on the evidence provided, the Court concludes the U.S. Entity has demonstrated an absence of a genuine issue of material fact as to whether the Mid-Cs utilized the improved stream flow for hydroelectric generation purposes after September 15, 2024.  Thus, the burden shifted to the Mid-Cs to demonstrate that an issue of fact exists.  The Court concludes the Mid-Cs have not met that burden.

The Court further declines the Mid-Cs' request to defer ruling on the motion until discovery is farther along.  ECF No. 63 at 22.  The U.S. Entity has presented sufficient evidence for the Court to conclude that the Mid-Cs have violated the terms of Article XI, Section 1 of the Treaty.  Additional discovery as to how much of the improved stream flow the Mid-Cs are utilizing does not affect the Court's determination.  Therefore, the Court grants the U.S. Entity's motion for partial summary judgment and concludes the Mid-Cs have violated Article XI, Section 1 of the Treaty as a matter of law.

//

//

//

//

//

//

//

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 21

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiffs/Counter-Defendants' Motion to Dismiss (ECF No. 49) is **DENIED**.

2. Defendants/Counter-Plaintiffs' Motion for Partial Summary Judgment (ECF No. 53) is **GRANTED**.

The District Court Executive is directed to enter this Order and furnish copies to counsel.

DATED May 4, 2026.



THOMAS O. RICE
United States District Judge

ORDER ON MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 22